## Case No. 17,687. ·

### The WILLIAM AND EMMELINE.

[1 Blatchf. & H. 66.] [1]

District Court, S. D. New York. Aug. 5, 1828.

BOTTOMRY BOND—ADVANCES IN FOREIGN PORT—POWERS OF MASTER.

1. It is essential to a bottomry transaction, that the money lent should run the hazard of the voyage.

2. A master can, in a foreign port, hypothecate his vessel for the payment, without maritime interest, of money advanced by a stranger for necessary repairs, and to secure the payment of a bill of exchange drawn by him on the owner of the vessel for those advances, although he is himself owner of cargo more than sufficient to pay for the repairs, and is solely concerned in interest in the voyage.

[Cited in The Hilarity, Case No. 6,480; The Boston, Id. 1,669; Thomas v. Osborn, 19 How. (60 U. S.) 28; The Eureka, Case No. 4,547; The Edward Albro, Id. 4,290; The Cumberland, 30 Fed. 450; The Scotia, 35 Fed. 909; Nippert v. The Williams, 39 Fed. 829; The Wilmington, 48 Fed. 568.]

3. Charleston (South Carolina) is, in respect to hypothecation, a foreign port to New-York.

4. Semble, that the master may bottomry the ship for necessaries in a foreign port, when he cannot procure the necessary means from the funds or credit of the owner, whether he has sufficient funds of his own on board to meet the expenses or not.

[Cited in The Gustavia, Case No. 5,876; Harris v. The Kensington, Id. 6,122; The Clotilda, Id. 2,903.]

5. In an action to recover advances made upon a bottomry bond, it is necessary for the libellant to exhibit an account of particulars and establish the necessity of the advances.

6. Whether the same rule holds in an action founded on a simple hypothecation, without maritime interest, quere.

In admiralty. The brig William and Emmeline, belonging to the port of New-York, put into the port of Charleston, in the state of South Carolina, disabled and needing repairs; and, while she was there, on the 18th of August, 1827, her master, in consideration of $511 48, advanced by the libellants, T. & T. Street & Co., drew upon the claimant, the owner of the brig, a bill of exchange for the amount, payable to the libellants, and, to secure the payment of the bill, executed what the libel alleged to be a bottomry bond upon the body of the vessel. The libel further alleged, that the money was advanced for necessary repairs, and that the bill of exchange had been protested for non-acceptance and non-payment. The answer admitted that the brig was hypothecated "in the manner stated in the libel," but set up for defence, that the master had no authority to hypothecate the ship; that Charleston was not a foreign port; and that the master was solely concerned in interest in the voyage, and had sufficient means of his own on board to procure the sum advanced, namely, lumber invoiced at $690 20. The instrument of hypothecation

1 [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

contained this clause: "and, for the better securing the payment of the said bill of exchange, with interest and expenses, unto the said T. & T. Street & Co., their heirs, executors, administrators and assigns, in any port or place where the said brig may be, and this bond be produced, I do hereby bind myself, and all and every of the owner and owners of the said brig, and particularly the said brig, her tackle, apparel and furniture, and the freight of the cargo on board of her, for the payment of the said bill of exchange, together with the interest, damages and expenses that may accrue thereon unto the said T. & T. Street & Co., their executors, administrators and assigns." The instrument was intended to secure only the sum for which the bill of exchange was given. There was no stipulation for marine interest, and the payment of the bill was not dependent on the hazard of the voyage.

Andrew S. Garr, for libellants.

Gerardus Clark, for claimants.

BETTS, District Judge. It is essential to the validity of a bottomry transaction, that the money lent should run the hazard of the voyage. The Nelson, 1 Hagg. Adm. 169; Abb. Shipp. (Ed. 1830) 117 et seq.; 2 Marsh. Ins. 632; 2 Bl. Comm. 458; Poth. Pret a la Grosse, art. 2, § 3. It is such risk that supports the marine interest which is always a constituent of a bottomry bond. The Augusta, 1 Dod. 283; Abb. Shipp. (Ed. 1830) 117 et seq.; Rucher v. Conyngham [Case No. 12,106]; The Mary [Id. 9,187]. In the instrument of hypothecation in this case, neither marine risk nor marine interest is provided for. The personal liability of the master and owner is secured at all events. All that is stipulated by way of hypothecation is, that the libellants shall have a lien on the vessel, her appurtenances and freight, during the voyage specified, and afterwards, until the satisfaction of the debt, interest and expenses. This instrument, though treated by the counsel in the pleadings and on the argument as a bottomry bond, and though denominated in the bond "an obligation of bottomry," is not so, in the acceptation of that peculiar security in the maritime law, not being subject to the incidents of a bottomry. The power of a master, in case of necessity, to raise money, by hypothecation of his ship, in order to prosecute his voyage, is not in question. The question is, whether the instrument in this case is a valid exercise of his authority. It is immaterial whether it be called a pawn, a hypothecation, a mortgage or a bottomry. The intention of the contract is, to pledge the brig and her freight for the payment of the disbursements of the libellants advanced for her repairs and refitting, and for which a bill of exchange was drawn by the master on his owner. His power to impawn the ship for her necessities, is declared by the earliest writ-

ers. 1 Moll. de J. Mar. bk. 2, c. 2, art. 14. In the case of Sampson v. Bragington, 1 Ves. Sr. 443, in addition to the hypothecation of the vessel, a bill of exchange was drawn by the master, in a foreign port, on his owner, to cover advances made in behalf of the vessel. The ship having been captured on her voyage home, the holder of the bill was allowed to recover the money of the owner; and it was also said that the ship was well hypothecated. This case is cited with approbation in Abb. Shipp. (Ed. 1830) p. 125. It may, perhaps, be questionable whether the English admiralty court would have enforced the hypothecation. The element of marine risk being wanting, the transaction was not a bottomry; and it may be that that court would have declined to take cognizance of a case where the advance made was not solely upon the credit of the ship, and on a bond properly of a bottomry character. The Augusta, 1 Dod. 283; The Rhadamanthe, Id. 201. In this country, however, admiralty will take cognizance of a hypothecation which is not a bottomry in form, when made in a foreign port. Robertson v. United Ins. Co., 2 Johns. Cas. 250. See Jennings v. Insurance Co. of Pennsylvania, 4 Binn. 244. Indeed, as a general principle, every maritime lien on a ship is a tacit hypothecation. Emerig. Contrat a la Grosse, c. 12, § 2. And what is a tacit hypothecation will not lose its effect by being made an express one. By the civil law, every person who repaired or fitted out a vessel, or lent money for those purposes, had a lien upon the vessel therefor, without any express hypothecation. Dig. lib. 42, tit. 5, lex 26; Novel. 97, c. 3; 1 Valin, Comm. 606; Hall, Emeri. 217. In England, on the contrary, such a lien can only be acquired by an express agreement of the owner, or of the master, acting within the scope of his authority. The Zodiac, 1 Hagg. Adm. 320, 325; Abb. Shipp. (Ed. 1830) 108 et seq.; Hussey v. Christie, 13 Ves. 594. In this country, the law has been recently settled by the highest tribunal, that in the case of a domestic ship, the municipal law (which is, in most states, the common law) prevails, and that such advances and credits are no charge upon the ship, unless made so by the law of the state where the debt accrues, but are only a claim upon the owner personally. In the case of foreign ships, however, the state laws do not prescribe the rule; and the maritime law of this country, following the civil law, gives the party, without the aid of any special contract, a lien upon the ship itself, which may be enforced by a suit in rem in the admiralty. The General Smith, 4 Wheat. [17 U. S.] 438; Abb. Shipp. (Ed. 1830) 116, note, 125, note. This doctrine became an element in the maritime usages of the middle ages, and thence was engrafted on the law maritime of modern Europe. 2 Cons. del Mare (Paris Ed. 1808) c. 32; 1 Azuni, Mar. Law, pt. 1, c. 4. It follows that, by the principles of the law maritime, a suit in admiralty to recover advances for the necessary supplies of a ship can, in the case of a foreign ship, be sustained in the American courts in all cases, without any express instrument of hypothecation. As a suit will lie in the admiralty on the lien implied by the law in such cases, there seems to be no reason for holding that the lien is lost because an express hypothecation is made by an informal instrument. Abb. Shipp. ubi supra. Should the bond in this case then be regarded as irregular, or inadequate to pledge the vessel, it would not, in admiralty, be considered an abrogation of the original lien, and the suit might be maintained on that by an appropriate amendment of the libel. The fact that the master is solely concerned in interest in the voyage, makes no difference. Third parties, dealing with him as master, are deemed to act upon the credit of the vessel, and are not chargeable with notice of his secret relations with the owner. Their security will, in this respect, be preserved to them, notwithstanding any special arrangements with the owner, detracting from the ordinary force of the master's acts, as implied from his office and trust. The rule applies as well when the master is charterer or lessee of the vessel, as when he is in command only on behalf of the owners (Rich v. Coe, Cowp. 636), unless the creditor has notice of his relation to the vessel. His possession as master is prima facie an authority from the owner to bind the vessel for necessaries supplied to her abroad. In the better acceptation of the doctrines of the law maritime, the master is ex officio agent or trustee of the owner, carrying, in that relation, a presumptive letter of credit in all places abroad where his vessel goes, to act for the owner in the employment of the ship, and in obtaining for her supplies and necessaries. Abb. Shipp. (Ed. 1830) 132.

It remains to be considered whether Charleston is, for purposes of hypothecation, a foreign port, with reference to New-York. The supreme court of this state has held that Charleston is not a foreign port in a case where a statute which gave to justices' courts, in New-York, jurisdiction over assaults committed in foreign ports, was adjudged not to authorize jurisdiction over an assault committed in Charleston. King v. Parks, 19 Johns. 375. And see Miller v. Hackley, 5 Johns. 375, and Overseers of Chatham v. Overseers of Middlefield, 19 Johns. 56. It has been decided otherwise, however, in respect to bills of exchange. Duncan v. Course, 1 Const. S. C. 100; Bayley, Bills (Bost. Ed.) 14, note. These cases would not, perhaps, be deemed controlling in the local courts on a question of maritime lien. By the civil law, and the laws of France, all ports where the owner does not reside are treated as foreign. 2 Valin, Comm. 10, 11; 2 Emerig. Mar. Law, 424, 436, 437. This is not the rule in England, however. The whole of England proper is considered, in respect to the owner-

ship of vessels, as the home of an Englishman; (Abb. Shipp., Ed. 1830, 123; Jac. Sea Laws, 363); but Ireland is regarded as foreign (The Rhadamanthe. 1 Dod. 202). It is believed, that though the point has not come up for direct adjudication, yet the courts of the United States have, in maritime questions in respect to the employment and refitment of vessels, considered the states foreign in relation to each other. The General Smith, 4 Wheat. [17 U. S.] 438; Murray v. Lazarus [Case No. 9,962]. In the case of La Ysabel, 1 Dod. 273, 274, Lord Stowell held two ports in Spain to be foreign to each other, on the ground that "the law does not look to the mere locality of the transaction. The validity and invalidity of the bond does not rest upon that circumstance only, but upon the extreme difficulty of communication between the master and owners." Without deciding how far this would be the correct principle upon which in all cases to determine what are foreign ports, I am of opinion that Charleston is to be regarded in this case as a foreign port, and that the master had authority to hypothecate the vessel there.

Another ground of defence relied on by the answer is, that even if the master might ordinarily pledge his vessel in the port of a state out of her domicil, he could not do so in this instance, because he had sufficient means of his own on board to procure the sum required for her necessities. It is well settled, that the master cannot raise money on bottomry when he has funds of the owner in his possession, or can raise the necessary sum upon the personal credit of the owner. The Nelson, 1 Hagg. Adm. 169. But that he is prohibited from raising money even on bottomry because he has sufficient funds of his own at command, is a point by no means made certain by the authorities. The principle has been broadly laid down, that if the master has or can command other funds, he has no authority to bottomry the ship. Walden v. Chamberlain [Case No. 17,055]; Boreal v. The Golden Rose [Id. 1,658]; Forbes v. The Hannah [Id. 4,925]. And, in support of this doctrine, there are impressive opinions both in England and in this country. Cupisino v. Perez, 2 Dall. [2 U. S.] 194; The Packet [Case No. 10,654]; The Zodiac, 1 Hagg. Adm. 320; The Sydney Cove, 2 Dod. 11; The Hero, 2 Dod. 139; Moll. de J. Mar. bk. 2, c. 11, § 11; Abb. Shipp. (Ed. 1830) 125, note. On the other hand, it is distinctly intimated by the supreme court of the United States, that the master may hypothecate the ship, unless he has the funds or credit of the owner to rely upon. The Aurora, 1 Wheat. [14 U. S.] 96. To the same effect is the law of the Hanse Towns. Jus. Mar. Hans. Hamb. (Ed. 1667) p. 51. tit. 6 art. 2, and Kuricke, Comm. (Ed. 1667) 176. See, also. 2 Marsh, Ins. bk. 2, c. 1, and Lex. Mer. Amer. 354. I am inclined to the opinion, that the true spirit of the maritime law is, that the master has a right to pledge the ship when he cannot command means to supply her necessities either from the funds or credit of

the owner, as well when the ship is laden with his own goods as when she is laden with those of a general freighter; but whether he can also subject her to marine interest, I do not undertake now to decide. It may be well asked, on what principle of justice can the master be compelled to appropriate his own property to the benefit of the shipowner. It is from no privity of contract, nor from any consideration peculiar to the master, arising out of the shipment. The owner derives the same advantage from the goods shipped by the master as if they were put on board by a third party. They are alike charged with freight, and subjected to average for the benefit of the ship, and the master, as freighter. has no community of interest with the owner of the vessel which is not shared by other freighters. If, in case of urgent necessity, the goods of a shipper are sold by a master for the repair or refitment of a vessel, the loss sustained is, by the maritime law, a lien on the vessel. Emerig. c. 4, § 9; Id., c. 12, § 4. If the master is bound to use his own goods for that purpose, it must be because he is, equally with the owner, bound to make repairs, and then he could have no claim to indemnity from the residue of the cargo. unless his loss was one of a general average character. Benecke, Ins. 252. Nor is it by any means certain he could have a lien on the freight and vessel for the amount of such expenditures. See Hussey v. Christie, 9 East, 426, and Smith v. Plummer, 1 Barn. & Ald. 575. Though, . should the freight chance to come to his hands, he might undoubtedly retain it as security. The case of Ingersoll v. Van Bokkelin, 7 Cow. 670, imports that a master has a lien on the freight for his disbursements and liabilities, and for his wages also. This case can hardly be reconciled with the scope and spirit of the law maritime, unless it is to be understood as making the possession of the cargo retained by the master to secure those demands. tantamount to a receipt of the freight chargeable upon the cargo, so that what is termed a lien becomes his right to retain security out of the freight paid him. It is believed no other case has recognised a lien in favor of a master for wages, upon the vessel or cargo in his hands: though. by special enactments, the master is sometimes placed upon the same footing with seamen in respect to wages. Code de Commerce. art. 191. This right to retain is a partial security, so far as it goes; but it would clearly be insufficient to indemnify a master for the privation of his property, since it covers no more than his actual disbursements. and he may be subject to losses from the forced sale of his shipment at a port for which it was not designed. and be obliged to forego the advantages anticipated by a sale at the port of destination. These would seem to be adequate reasons for allowing the master, in a proper case of necessity, to raise money on a hypothecation of the vessel. though he has or can command sufficient funds of his own. The maritime law guards, with vigilant

circumspection, the exercise of the power of hypothecation by bottomry, and it can rarely happen, that if the enjoined requisites are observed, an owner's interest can be essentially compromised by a master, even in raising money upon such pledge of the vessel.

The decision of this case does not, however, rest necessarily upon these principles, inasmuch as the bond in this case was not a bottomry. The transaction, as proved to the court, was a credit to the owner and to the vessel herself, procured by the intervention of her master in a foreign port, and of such a nature as to create a lien upon the vessel, without express stipulation. When an advance is made upon bottomry, the libellant must establish the necessity of the advances, and exhibit an account of the particulars, that the court may pass upon that fact. Walden v. Chamberlain [supra]; Crawford v. The William Penn [Case No. 3.373]; The Mary [Id. 9,187]; The Aurora, 1 Wheat. [14 U. S.] 96, 103, 106. By the French law, when the bond of hypothecation alleges that the loan was on the body and keel of the vessel, it is received as full evidence that the money was employed in the use of the ship and for the necessities of the voyage. 2 Valin, Comm. 9; Poth. Pret a la Grosse, Avent. art. 4, § 2. But by our law, as appears from the cases cited, the court must examine the proceedings, and determine the propriety and necessity of the bottomry pledge. Whether the principles of maritime law render it incumbent on the libellant, when there is a simple hypothecation without maritime interest, to exhibit satisfactory evidence that his demand arose for necessaries furnished the ship, it is not necessary in this case to decide. The authority of the master to bind the owner is limited to the supply of necessaries for the ship. Abb. Shipp. (Ed. 1830) 116, note. The master is declared by all the authorities to be the agent of the owner pro hac vice. Abb. Shipp. (Ed. 1830) 108, 109. If, as is contended in this case, the libellants must prove the necessity of the advances in order to sustain their lien on the vessel or an action against the owner, it would seem that the general law governing the rights of third persons arising out of transactions with agents must, in respect to this class of contracts, have a restricted application. The familiar rule of law is, that the acts and declarations of the agent within the scope of his authority are evidence against his principal. 2 Starkie, Ev. pt. 4, pp. 41, 43. The well-known distinction between general and special agents would not account for any change of the principle in regard to maritime agencies. For, though a special agent (which a ship-master is) must be strictly held within the limits of his authority (2 Kent. Comm. 620 et seq.; Paley, Ag. c. 3), yet, where the authority is established, the like doctrine as to his proceedings governs in both cases. The plaintiff need show no more than the dealing of the agent, and that his acts or declarations were in conformity with his authority. At common law, an authorization to a broker or mechanic to provide necessaries for repairing a ship or house, would refer to the judgment of the agent the determination of the necessity of the particulars furnished, and the principal would be bound by his decision (2 Kent, Comm. 617. 621, 629); and that doctrine ought to have the same effect in respect to the doings of a ship-master as agent of the owner.

If it is necessary to establish in this case that the articles furnished were necessary for the use of the vessel, the libellants rely upon the general allegations of the libel, which are not denied by the answer, and upon letters of the claimant, which I am inclined to regard as substantially admitting the fact. These letters show that the claimant was duly apprized of the circumstances, and was satisfied at the time that the vessel had been repaired in a state of distress by the funds of the libellants, and that the amount claimed by them had been expended for that purpose. The recognition of these facts by the claimant, whether directly made or whether necessarily to be implied from the circumstances of the case, must be equivalent, in effect, to any other mode of proving them. The manner in which the suit has been contested would naturally have led the libellants to rely upon slight proofs on this point. The answer does not deny the distress of the vessel, nor that the advances were made, nor that they were expended upon necessaries for the voyage, but assumes, as ground of exoneration, that the master had no right to contract the debt on account of the owner, at Charleston, that not being a foreign port, and that the master was solely interested in the voyage, and had means to meet the charge, and was therefore alone liable. It is true that the allegations of the answer are broad enough to permit the claimant to avail himself of the other objections; yet, if they must not be considered as impliedly waived, they are so faintly urged as to render a less amount of evidence adequate to surmount them. The case is in such a posture, that if I were not satisfied by the evidence offered, I should, for the reasons above stated, permit it to stand over for further proof upon these particulars. I do not now deem it necessary to require that further proof from the libellants: but, upon a proper suggestion on the part of the claimant, that there is reason to suppose there are charges in the claim for which he ought not to be liable, I shall be ready to refer the matter to the clerk, to report to me the items of the demand and the evidence upon which they rest. If no such application is made, the amount of the bond, with interest and costs, is decreed to the libellants. Decree accordingly.

WILLIAM & SAMUEL, The (UNITED STATES v.). See Case No. 16,701.

WILLIAM ARTHUR, The (UNITED STATES v.). See Case No. 16,702.